UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                  Case No. 20-CR-170 (JPS/NJ)

MICHAEL KARMO,

        Defendant.

## UNITED STATES' RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS AND REQUEST FOR A *FRANKS* HEARING

### Introduction

On August 23, 2020, the officer-involved shooting of Jacob Blake sparked civil unrest and violence in Kenosha, Wisconsin. In the days following the shooting, rioters damaged and set fire to local businesses, public buildings, vehicles, and law enforcement property. Several people were injured; a police captain was struck in the head with a brick. Wisconsin's Governor declared a state of emergency, and the National Guard was sent to the city. On August 25, 2020, during the unrest, a 17-year-old, who had traveled to Kenosha from out of state, shot and killed two people and injured another using an assault rifle.

Intrigued by this unrest, Michael Karmo, a multiple-time convicted felon, and his friend, Cody Smith, loaded an assault rifle, a shotgun, two handguns, ammunition, a silencer, body armor, and other items into their vehicle and began to drive from Missouri to Kenosha. Before setting out, Karmo took a photo of himself and Smith holding long guns. He sent the photo to a woman in Iowa. He also sent her a photo of a firearm with a large drum that he called the "game changer." After Karmo and Smith stopped to see the woman in Iowa, she became concerned and

reported them to local police. Police in Iowa notified Kenosha police, who in turn alerted the FBI. Working as quickly as possible to prevent additional violence in Kenosha, FBI agents obtained location information from Karmo's cell service provider.

After law enforcement located and detained Karmo and Smith, both individuals consented to a search of their vehicle and hotel room. As a result of the consent searches, agents recovered an AR-15 assault rifle, a 12-gauge shotgun, two loaded 9mm handguns, 67 rounds of 9mm ammunition, 131 shotgun shells, a homemade silencer, multiple firearm magazines, a firearm muzzle attachment, a drone, body armor, tactical gear, a dagger, and other items. A consent search of Karmo's phone also led to discovery of a video in which he filmed an individual chanting "Justice for Jacob Blake." Referring to this individual, Karmo stated that he would be "back to take him out later." All of this ultimately led to Karmo being indicted for being a felon in possession of a firearm and unlawful possession of a silencer.

Karmo now seeks to suppress evidence recovered during the consent searches and from the execution of subsequent search warrants. He also requests a *Franks* hearing. ECF 36. For the reasons set forth below, the Court should deny the defendant's motion in its entirety.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As mentioned above, the officer-involved shooting of Jacob Blake led to days of civil unrest and violence, ranging from arsons to the killing of two people by an individual armed with an assault rifle, who had traveled to Kenosha from Illinois. All of this drew national attention. *See Jacob Blake unrest in Kenosha: Live updates on protests, violence following police-involved shooting,* https://www.foxnews.com/us/jacob-blake-unrest-in-kenosha-live-updates (Aug. 31, 2020). A visit by the President of the United States to Kenosha on September 1, 2020, also received national media attention.

On September 1, 2020, just after 4:00 p.m., Sergeant Hecker, of the Kenosha Police Department ("KPD"), received a call from Officer Lindley of the Waverly (Iowa) Police Department ("Waverly PD") alerting KPD of two men traveling from Missouri to Kenosha, armed with firearms. According to an email from Sergeant Hecker to other KPD personnel, Officer Lindley called KPD to report that a woman had just come to the Waverly PD to report that Michael Karmo and another man were traveling to Kenosha to "loot and 'pick people off.'" *See* **Exhibit A** (email from Sgt. Hecker, September 1, 2020, at 4:22 p.m.) The woman reported that the men had two long guns concealed in the vehicle. *Id.* Officer Lindley provided Sergeant Hecker with a screenshot from the woman's phone showing text messages with Karmo, as provided below:



**Exhibit B** (Email from Off. Lindley to Sgt. Heckler on September 1, 2020, at 4:20 p.m. with photo attached).   In the text exchange, Karmo sent a picture of himself (on the right) and a man later identified as Cody Smith, both holding long guns.   After sending that picture, Karmo also sent the woman a photo of a rifle with a drum magazine with the message "This the game changer."

The woman provided a written statement to Officer Lindley on September 1, 2020.   It read in full as follows:

> Michael Karmo came from Misourri [sic.] with a new friend I've never met before. They said 2 hours and 45 [minutes] away... I asked him to stop because we don't see each other very much. Michael and his friend got to my house at 12:15 a.m. [on September 1, 2020]... He told me he couldn't stay long because of all the guns in the back of his vehicle... So he asked me to come with him one more time to Knosha [sic.] to see what's going on. I said no. I wouldn't be able with schedule. And he told me he couldn't stay long with the two machine guns he had in the car. So he left on his way to Kanosha [sic.]... I block him on Facebook.

**Exhibit C.**

KPD informed the FBI of the information from the Waverly PD.   Law enforcement reviewed Karmo's Facebook page and observed multiple photos showing Karmo in possession of firearms.   **Exhibit D.**   His Facebook page also included references to a militia and the federal statute 18 U.S.C. § 242 (conspiracy against rights).   Law enforcement quickly determined that Michael Karmo was a convicted felon, and therefore could not legally possess firearms.

Believing that Karmo was in possession of firearms and intended to injure people during the civil unrest in Kenosha, FBI Special Agent Steven L. Andreoni completed the AT&T Exigent Circumstances Form to obtain call records with cell site location information for telephone number 619-708-3605, pursuant to 18 U.S.C. § 2702(c)(4).   **Exhibit E.**   SA Andreoni requested updated cell site location data every 15 minutes for a period of 48 hours.   *Id.*   In support of the request, SA Andreoni provided the following brief description of the facts, as he knew them: "Subject traveling to Kenosha, WI with long guns/rifles to 'pick people off and loot.'"   *Id.*

4

Contemporaneous with FBI's request for emergency cell site data from AT&T, United States Magistrate Judge Stephen E. Dries issued an order allowing for the installation and use of a pen register and trap and trace device or process ("pen-trap device") on the cell phone number 619-708-3605. **Exhibit F -** *In Re Application of the United States of America for an Order Authorizing the Installation and Use of Pen Register and Trap and Trace Device or Process,* Case No. 20-M-254 (SED).

Beginning at approximately 6:17 p.m. on September 1, 2020, FBI began receiving cell site location data from AT&T for Karmo's phone, which reflected the phone was at or near the La Quinta Inn, in Pleasant Prairie, Kenosha County, Wisconsin. At approximately 7:40 p.m., law enforcement located Karmo and co-defendant Cody Smith in the parking lot of the La Quinta Hotel. Smith was in the driver's seat of Karmo's Toyota Highlander. Smith and Karmo were promptly detained. They both consented to a search of the vehicle. Among other items, law enforcement recovered an AR-15 assault rifle, a Mossberg 12-gauge shotgun, a Taurus 9mm handgun, a homemade silencer, multiple firearm magazines, a firearm muzzle attachment, a drone, body armor, tactical gear, and a folding knife with a 5½ inch serrated blade. *See* **Exhibit G** (Photos of some recovered items).

Karmo and Smith also consented to a search of their room at La Quinta hotel, where law enforcement recovered a loaded 9mm handgun, a dagger with a 8¾-inch blade, a twisted cable survival saw, 67 rounds of 9mm ammunition, and 131 shotgun shells in a duffle bag, among other items. *See* **Exhibit H** (Photos of some recovered items). Law enforcement also photographed some items that were not initially recovered, including a gray cooler on wheels and two birth certificates for Michael Karmo, one from San Diego and one from Mexico. *Id.*

On September 1, 2020, at the request of Wisconsin law enforcement, Officer Lindley also prepared a report detailing his interview of the tipster. **Exhibit I.** According to the report, the

tipster told Officer Lindley that Karmo was traveling from Missouri to Kenosha, Wisconsin. She reported that she had originally planned to go with Karmo with the intention of looting, but she decided not to go with him. The tipster met up with Karmo and a man she did not know in parking lot around 12:15 a.m. Karmo told her that they could not stay long because they had "too much shit in the car." The tipster told Officer Lindley that Karmo had a Yeti cooler with guns in it. The tipster allowed Officer Lindley to take a screen shot of her text messages with Karmo, including the exchange provided above. The tipster replied to the photo of the rifle with the drum magazine, "What the fuck is that a drum for the bullets," to which Karmo replied, "Yeah it's a Tokyo Maruie 200rd." According to Officer Lindley's report, the tipster reported that Karmo told her that people were just going up to Kenosha and "picking people off." She told Officer Lindley that Karmo did not state that he was going to do that. The tipster reported that Karmo had been to prison before and used telephone number 619-708-3605. The tipster reported that she would like anonymity in her report of the information. The FBI received this report for the first time at 3:47 a.m. on September 2, 2020 – after Karmo and Smith were in custody. **Exhibit J.**

On September 2, 2020, after Karmo was in custody, FBI agents met with the tipster to ask her additional questions. She reported that Karmo frequently walked around with a firearm in his waistband and played "Rambo" in the backyard with various firearms. She had seen Karmo with 3-4 guns in his possession within the last few months. He bought firearms through the mail and manually put the firearms together himself "shaving down the firing pin" and making the firearms untraceable to law enforcement.

As far as the activity on August 31 into September 1, 2020, she reported that when she met with Karmo, he was with an unknown white male. Karmo told her he had two firearms in a Yeti cooler inside the vehicle, but she did not see the firearms that evening. Karmo told her he was going to go to Kenosha with the intention of possibly using the firearms on people. She feared

that with Karmo's increase in conspiracy theory talks and other "crazy" political talk he was not in the right mindset to have a firearm. She told her mother about the interaction with Karmo, and her mother called the Waverly PD. The tipster then went to the Waverly PD to provide a statement and photos to investigators.

On September 3, 2020, FBI Special Agent Jeffrey Atwood applied for a warrant to search Karmo's residence in Hartville, Missouri, in search of evidence of violations of Title 18, United States Code, Sections 922(g)(1) (Felon in possession of firearms and ammunition) among other gun charges. Def. Mot. Exhibit 5 (hereinafter "Missouri Affidavit"). On that same date, the Honorable David P. Rush, Chief Magistrate Judge for the Western District of Missouri, issued the search warrant. While executing the search warrant at Karmo's residence, law enforcement located a "bunker" or "safe room" containing three pistols, a shotgun, a loaded drum magazine for an AR-15, fourteen different magazines (each holding 15 to 30 rounds), a large quantity of various-caliber ammunition, and a homemade silencer.

On September 4, 2020, FBI Special Agent Chad Piontek applied for a warrant to return to Hotel Room #148, at La Quinta Inn & Hotel in Pleasant Prairie, to seize several of the items that law enforcement had photographed but had not seized as evidence, including the cooler, the birth certificates for Michael Karmo, and clothing that referenced assault rifles, as evidence of violations of Title 18, United States Code, Sections 922(g)(1) (felon in possession of firearms and ammunition), other firearms-related charges, and violation of Title 18, United States Code, Section 911 (falsely claiming to be a United States citizen). Def. Mot. Exhibit 4 (hereinafter "Hotel Affidavit"). The Honorable Stephen E. Dries, Magistrate Judge for the Eastern District of Wisconsin, issued the search warrant, and law enforcement returned to the hotel room to recover the additional items.

On September 15, 2020, a grand jury returned an indictment charging Karmo in Count One with being a felon in possession of firearms and in Count Two with possession of an unregistered silencer.[1] ECF 10.

Karmo has now filed a motion to suppress and a request for a *Franks* hearing. ECF 36. Karmo first argues that when law enforcement applied for and obtained an emergency ping from AT&T, exigent circumstances did not exist. Karmo next argues that the affidavits submitted in support of two search warrants neglected to provide the tipster's background information and contained a material false statement that was intentionally or recklessly made.

For the reasons explained below, the Court should deny Karmo's motion in its entirety. First, exigent circumstances justified the request for his cell site location data, and the agent seeking the data acted in good faith. Second, the affiants were not obligated to include the tipster's background information in their affidavits. Third, as to his allegations that the warrants contained false statements, the defendant has failed to make the requisite "substantial preliminary showing," and thus, his request for a *Franks* hearing must be denied. Finally, because the search warrant affidavits are supported by probable cause, his motion to suppress must be denied.

## II. ARGUMENT

### A. Exigent Circumstances Justified Seeking Location Data from AT&T for Karmo's Cell Phone.

As Karmo notes, there is a split of authority as to whether a cell phone ping is a search for Fourth Amendment purposes. That split followed the Supreme Court's decision in *Carpenter v. United States*, -- U.S. --, 138 S.Ct. 2206 (2018), which held that the Fourth Amendment required a warrant for police to obtain certain cell phone information, including seven days of historical

---

[1] Cody Smith was also charged in this Indictment. He has since pled guilty to being an unlawful user of marijuana in possession of two firearms and is awaiting sentencing.

location data, but which expressly declined to address whether obtaining real-time data constituted a Fourth Amendment search.

However, this Court need not address the issue. Even assuming that the brief ping in this case was a Fourth Amendment search, *Carpenter* did not call into question the long-standing exceptions to the warrant requirement. One well-recognized exception applies when "the exigencies of the situation" make a warrantless search objectively reasonable under the Fourth Amendment. *Kentucky v. King,* 563 U.S. 452, 460 (2011) (quoting *Mincey v. Arizona,* 437 U.S. 385, 394 (1978)). Specifically, warrantless searches will be allowed when exigent circumstances exist which require immediate action by the police and the police do not have time to secure a warrant. *Michigan v. Tyler,* 436 U.S. 499, 509, (1978); *United States v. Saadeh,* 61 F.3d 510, 516 (7th Cir. 1995).

Courts evaluate a claim of exigent circumstances from the perspective of the police officer at the scene to determine whether the police had a reasonable belief that there was a compelling need to act quickly and that there was no time to obtain a warrant. Exigent circumstances exist when there is a reasonable belief by police that public safety may be threatened. *United States v. Hardy,* 52 F.3d 147, 149 (7th Cir. 1995); *see also United States v. Ware,* 914 F.2d 997, 1001 (7th Cir. 1990) (holding that retrieval from a car of a gun believed to have been used in a recent robbery was justified as exigent circumstances); *United States v. White,* 607 F.2d 203, 208 (7th Cir.1979) (averting possible danger to police and the public justified a search for missing gun in automobile). A willingness to use a weapon can be one such circumstance that can compel exigency. *United States v. Daws*, 711 F.3d 725, 728 (citing *Estate of Bing v. City of Whitehall,* 456 F.3d 555, 564 (6th Cir. 2006)).

9

The exigent circumstances exception applies to all types of searches and seizures under the Fourth Amendment, including searches of phone data. *United States v. Banks*, 884 F.3d 998, 1011-12 (10th Cir. 2018).  As cited by the defendant, some factors to be considered are:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970) (en banc).  "Such factors, however, are "illustrative, not exhaustive," as the determination is an "objective one that turns on [an] examination of the totality of the circumstances" of each individual case.  *United States v. Caraballo*, 831 F.3d 95, 103 (2d Cir. 2016) (internal citations omitted).

Exigent circumstances existed in this case.  Not only did the tipster report information that, given the totality of the circumstances, reflected the strong possibility that a violent crime was likely to occur, she further supplied at least a reasonable belief that Karmo was armed.  The tipster was concerned enough with Karmo's behavior, statements, and actions that she went to the Waverly PD to report it.  She reported that Karmo and his associate, while armed with "machine guns" (**Exhibit C** – written statement), had elected to drive from Missouri to Kenosha during civil unrest.  She reported that although she had not seen the guns, Karmo made statements about needing to get on the road because they had "too much shit in the car."  She further explained that Karmo and his associate had guns in a Yeti cooler in the back of the car.  Moreover, on the way to Iowa, Karmo texted her a photo of himself holding an assault rifle and Smith holding a shotgun (consistent with the two firearms recovered from their vehicle the evening of September 1, 2020). **Exhibit B; Exhibit G.**  Karmo also texted her a photo of an assault rifle and referred to it as "the game changer."  *Id.*  Consistent with the tipster's information, Karmo's Facebook page is riddled with photos of Karmo, a convicted felon, in possession of numerous firearms, including assault

10

rifles.

Despite the above, Karmo argues that "there was no 'violent nature' of an offense apparent to law enforcement." Def. Mot. at 10. However, he completely ignores the unrest and violence that had already occurred in Kenosha in the days leading up to September 1, 2020. He ignores that the Governor had issued a state of emergency and the National Guard had been sent to Kenosha. He also ignores that just days earlier, a 17-year-old had traveled to Kenosha from out of state. Using an assault rifle, this individual had shot and killed two people and injured a third person. Given the context of what was occurring in Kenosha, law enforcement's receipt of information that a convicted felon and another man had driven over 12 hours (Hartville, MO, to Kenosha, WI, via Waverly, IA) to a powder keg environment armed with firearms, presented sufficiently grave possibilities justifying the emergency ping. Special Agent Andreoni, Officer Lindley, and the law enforcement team were right to be concerned for the safety of the public given the facts of this case. This was great police work – as opposed to a Fourth Amendment violation.

Moreover, based upon the tipster's information and the text Karmo sent to her showing him in possession of an assault rifle, combined with Karmo's Facebook posts and prohibited status, law enforcement had probable cause to believe that he was illegally possessing firearms. Law enforcement further had a strong reason to believe that by obtaining location data for Karmo's cell phone, they would locate Karmo and prevent him from possessing and using firearms during the civil unrest occurring in Kenosha. They could not afford the time it would have taken to draft a warrant application, swear it out upon approval, serve the warrant on AT&T, and wait for AT&T to process the warrant – a process that could take from hours to days depending on the provider's responsiveness.

Significantly, in making an exigency determination, courts have also considered the degree to which the officers, in conducting the search, intruded on a defendant's privacy interests -- the

greater the invasion of privacy, e.g., of a person's home, *see Florida v. Jardines*, 569 U.S. 1, 6 (2013)("[W]hen it comes to the Fourth Amendment, the home is first among equals."), and the clearer the restrictions on police behavior in the absence of exigency, the more stringent the requirements that the search be urgently undertaken in order for the exigency exception to apply.

Law enforcement, in this case, did not rely on exigency to search Karmo's home, his vehicle, or even his hotel room. Instead, upon receiving information from Waverly PD, they requested cell phone location data held by AT&T, the least intrusive method available to them. This information, after AT&T approved of the request and began sending data, further corroborated the tipster when it showed that Karmo's phone was in Kenosha County. Then, upon observing Karmo and Smith in the parking lot of La Quinta, occupying a vehicle consistent with the tipster's description, law enforcement approached Karmo and Smith in a peaceful manner. They did not run toward them with guns pointed in their direction. They merely approached them, confirmed that Michael Karmo was one of the two men, and asked whether there were any firearms in the vehicle, to which Smith falsely claimed ownership of all the firearms.[2]

Simply put, based upon a totality of the circumstances, including the unrest in Kenosha, exigent circumstances supported law enforcement's decision to obtain Karmo's cell phone location data for less than two hours on September 1, 2020.

### B. Law Enforcement Acted in Good Faith in Obtaining the Emergency Ping

Even if a warrant would have been required in this case, application of the exclusionary rule would be inappropriate because Special Agent Andreoni relied in good faith on the Stored Communications Act, 18 U.S.C. § 2702(c)(4), which allows cell phone providers, like AT&T, to

---

[2] In his guilty plea, Smith pled guilty to possessing one of the three firearms recovered from the vehicle (the shotgun) and the firearm recovered from the hotel (the Ruger 9mm handgun). In his post-arrest statement, he admitted to possessing these guns and reported that the remaining two guns and the silencer/suppressor were Karmo's.

disclose cell site location data "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." If a person's phone data is collected in good-faith reliance on the Stored Communications Act, the evidence should not be suppressed. *See Illinois v. Krull*, 480 U.S. 340, 342 (1987) (finding exclusionary rule not applicable where "officers act in objectively reasonable reliance upon a statute authorizing warrantless administrative searches, but where the statute is ultimately found to violate the Fourth Amendment" (emphasis omitted)); s*ee, e.g., United States v. Hammond*, No. 3:18-CR-5 RLM-MGG, 2018 WL 5292223, at *2–3 (N.D. Ind. Oct. 24, 2018) (denying motion to suppress when detective believed in good faith that a federal statute allowed him to act as he did, based on what he (and AT&T) believed to be an emergency, rather than obtaining a warrant).

Based upon the email correspondence and other documentation in this case, SA Andreoni acted in good faith based upon the information before him: two men, armed with firearms, had driven from Missouri to Kenosha, during a state of emergency and civil unrest. According to the initial reports SA Andreoni received, the two men were intending to "pick people off and loot." SA Andreoni relied upon the KPD Sergeant's reported information from Waverly PD, which provided a basis to believe "an emergency involving danger of death or serious physical injury to any person requir[ing] disclosure without delay." 18 U.S.C. § 2702(c)(4); **Exhibit A**. At the time, SA Andreoni had no reason to question the veracity of the Waverly PD information, particularly when Karmo's Facebook page revealed Karmo's routine possession of firearms (**Exhibit D**) and his status as a convicted felon. Moreover, AT&T, the provider, in good faith, relied upon the request submitted by a sworn law enforcement officer and provided the records.

In his motion, Karmo makes much of the fact that the report prepared by Officer Lindley later on September 1, made clear that Karmo only reported that "people were getting picked off"

not that he intended to pick people off.  *See* Def. Mot. at 9.  That distinction does not alter the exigent circumstances facing law enforcement on September 1.  After all, the situation still involved a convicted felon bringing an assault rifle and ammunition to the scene of unrest and two recent killings.  However, regardless of the significance placed on the distinction between who would be "picking people off," that piece of information was not known to the FBI until 3:47 a.m. on September 2, 2020, when the Waverly PD emailed Officer Lindley's follow-up report.  This was well after the ping had been obtained.   As such, any suggestion that the FBI acted in bad faith when trying to prevent further violence is meritless.

For all of these reasons, defendant Karmo's motion to suppress the cell phone ping records, along with all of the evidence seized as a result of the defendant's consent to a search of his vehicle and hotel room, should be denied.

### C.    The Affidavits Contained Probable Cause Supporting the Searches.

Karmo next argues that probable cause did not exist for the search warrants obtained on September 3, 2020 (for the Missouri residence), and September 4, 2020 (for the recovery of additional items from Karmo's hotel room).   Probable cause exists where a judicial officer, given the totality of the circumstances set forth in the affidavit, can make a common-sense determination that there is a fair probability that contraband or evidence of a crime will be found in a particular place.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).   The issuing judge "is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense, and . . . need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit."   *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995).

Reviewing courts give great deference to an issuing judge's probable cause determination. *Gates*, 462 U.S. at 236.   Moreover, "[t]here is . . .   a presumption of validity with respect to the affidavit supporting the search warrant."   *Franks v. Delaware*, 438 U.S. 154, 172 (1978).   When

a defendant requests a *Franks* hearing to challenge the supporting affidavit, he must make a substantial preliminary showing that: "(1) the warrant affidavit contained false statements [or omissions], (2) these false statements [or omissions] were made intentionally or with reckless disregard for the truth, and (3) the false statements [or omissions] were material to the finding of probable cause." *United States v. Mullins*, 803 F.3d 858 at 861-62 (7th Cir. 2015); *see also United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013). Because these elements are difficult to prove, *Franks* hearings are rarely held. *United States v. Slizewski*, 809 F.3d 382, 385 (7th Cir. 2016).

A defendant's burden in this context is significant, because "[a]llegations of negligent or innocent mistakes do not entitle a defendant to a hearing, nor do conclusory allegations of deliberately or recklessly false information." *McMurtrey*, 704 F.3d at 509. A defendant must "identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses." *Id.* Negligence by the affiant does not constitute reckless disregard for the truth. *See United States v. A Residence Located at 218 Third Street*, 805 F.2d 256, 258 (7th Cir. 1986); *United States v. Prideaux-Wentz*, 543 F.3d 954, 962 (7th Cir. 2008). Instead, to prove reckless disregard for the truth, the defendant must prove that the affiant, or any other government agents who provided information upon which the affiant relied, "in fact entertained serious doubts as to the truth of his allegations." *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (internal quotations omitted).

As the Seventh Circuit has repeatedly stated, "[c]onclusory, self-serving statements are not enough to obtain a *Franks* hearing." *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009). With this in mind, "*Franks* hearings are rarely required." *Id.* at 670. Finally, if sufficient factual allegations existed warranting the search irrespective of the affiant's alleged errors, a hearing is

unnecessary and the motion should be denied.   *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006).

The defendant cannot clear this high bar.

       **1.**     **The Defendant Has Failed to Make the "Substantial Preliminary Showing" Necessary to Obtain a *Franks* Hearing.**

Karmo claims that the search warrant affidavits contained material misrepresentations warranting a *Franks* hearing.   He focuses on the inclusion of the initial reporting that Karmo intended to "loot and possibly pick people off" as the material misstatement, but ignores the additional information provided throughout the affidavits summarizing the tipster's statements to law enforcement on September 1, 2020, and September 2, 2020.   Put another way, Karmo focuses on the information in Paragraph 8 (of Hotel Affidavit), provided in relevant part as follows:

> 8.     On September 1, 2020, at approximately 4:22 p.m. Central Time, the Kenosha Police Department advised FBI that a law enforcement agency in Iowa had received a tip that KARMO and an unidentified male were in possession of firearms and traveling from Missouri to Kenosha, Wisconsin, to loot and possibly "pick people off." The tip provided telephone number 619-708-3605 for KARMO. FBI also received photographs of text messages between KARMO and the tipster. The communications reflected that KARMO sent a photograph of himself holding a rifle and another white male holding what appeared to be a shotgun. KARMO sent another picture of a rifle with a drum-style magazine in it. KARMO included the message, "This is the game changer" with the photo.   Karmo's text messages are shown below:



Def. Exhibit 4, at 9-10; Def. Exhibit 5, at 4-5.    However, he completely overlooks the information

contained in Paragraphs 21-24 (of Hotel Affidavit), provided as follows:

> 21. On September 1, 2020, at approximately 3:00 a.m., FBI received a report from a local police department in Iowa regarding its encounter with the tipster (hereinafter "citizen witness" or "CW") described above in Paragraph 6. The initial report detailed that KARMO was traveling from Missouri to Kenosha, Wisconsin, on September 1, 2020. CW had planned to go to Kenosha with KARMO to loot, but CW decided not to go.

> 22. According to the Iowa report, KARMO told CW that people were going up to Kenosha and "picking people off"; however, KARMO did not state that he personally would do that.

> 23. On September 2, 2020, law enforcement officers met with CW again.   CW reported that KARMO frequently walked around with a firearm in his waistband and played "Rambo" in the backyard with various firearms.   CW has seen KARMO with 3-4 guns in his possession within the last few months.   He bought firearms through the mail and manually put the firearms together himself "shaving down the firing pin" and making the firearms untraceable to law enforcement.

> 24. As far as the activity on August 31, 2020, CW reported that when CW met with KARMO, he was with a white male CW did not know.   KARMO told CW he had two firearms in the vehicle, but CW did not see them that evening. KARMO told CW he was going to go to Kenosha with the intention of possibly using the firearms on people.   CW feared that with KARMO's increase in conspiracy theory talks and other "crazy" political talk he was not in the right mind set to have a firearm.

Def. Exhibit 4, at 16-17; Def. Exhibit 5, at 11.

Put simply, the affidavits in question contained essentially the same information that

Karmo is now alleging was intentionally omitted.   For example, the affidavits detail that the

tipster initially intended to go to Kenosha with Karmo to loot.   *See* ¶21, Hotel Affidavit.   The

affidavits further clarified that "Karmo *did not state* he personally would [pick people off]."   *Id.*

¶22 (emphasis added).   Although the tipster later reported that Karmo did tell the tipster/citizen

witness that he intended to possibly use the firearms on people.   *Id. ¶24.*

To the extent Karmo construes the inclusion of the initial information that was reported to

Kenosha PD as a misstatement in the affidavit, his accusation that it was made intentionally or

recklessly is not accompanied by the requisite offer of proof to obtain a *Franks* hearing.   Nor has

17

Karmo made the "substantial preliminary showing" that the false statement was material to the probable cause determination. Even if it had been a mistake to include the information originally reported to the FBI (a premise with which the government disagrees), it does not follow that a *Franks* hearing is required.

Relying solely upon the conclusory, self-serving statement that the contents of the affidavit were "conveyed in such a way as to change the entire meaning of what [the tipster/citizen witness] actually said," (Def. Mot. at 12) the defendant argues that he has made the "substantial preliminary showing" required to obtain a *Franks* hearing. He has not. Bald assertions of improper intent are insufficient to obtain a *Franks* hearing.

Instead, *Franks* requires that "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished or in their absence satisfactorily explained." 438 U.S. at 171. The defendant fails to make such a showing here. Other than his broad accusation that the affiants showed reckless disregard for the truth, there is nothing to indicate that the affiants lied or otherwise recklessly disregarded the truth in their affidavit. In fact, the affiants included the information that Kenosha PD and SA Andreoni initially replied upon – that Karmo and his associate traveled to Kenosha, armed with firearms, to loot and "pick people off" – but also provided the later clarification as to the tipster's statements to Waverly PD Officer Lindley on September 1, 2020 (Paragraphs 21-22 – Hotel Affidavit), and the FBI agents on September 2, 2020 (Paragraphs 23-24 – Hotel Affidavit). The defendant has not produced (and could never produce) a sworn affidavit or an otherwise reliable offer of proof indicating that the affiants were aware when the emergency ping was obtained, that the tipster had not actually reported that Karmo intended to "pick people off." In the absence of such an offer of proof, the record indicates only that the affidavits included the information initially relied upon, but also provided corrective, clarifying information in subsequent portions of the affidavit.

### 2. The Affiants Were Not Required to Include *Clark* Credibility Factors for a Tipster or Citizen Witness.

Karmo argues that the warrant affidavits are deficient because they do not include a reliability statement for the tipster/citizen witness. Karmo argues that the "reason it's so important to provide information about an informant's credibility is that 'informants, especially in drug cases, can be unreliable and motivated by rivalries or revenge.'" Def. Mot. at 15 (quoting *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019)).

The Seventh Circuit has determined that four factors are important in assessing a tipster's credibility: (1) firsthand observation by the tipster; (2) degree of detail provided by the tipster; (3) corroboration of tipster's information by the police; and (4) testimony by the tipster at the probable cause hearing. *See United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995). "[F]irst-hand observations support a finding of reliability." *United States v. Buckley,* 4 F.3d 552, 555–56 (7th Cir. 1993); *see also Gates,* 462 U.S. at 234 ("even if we entertain some doubt as to an informant's motives, his *explicit and detailed description* of alleged wrongdoing, along with a statement that the event was *observed first hand,* entitles his tip to greater weight than might otherwise be the case."). The degree of detail that an informant provides, as well as the corroboration by an officer's independent investigation of the informant's information, also serve to support a finding of reliability. *United States v. Pless,* 982 F.2d 1118, 1125 (7th Cir.1992).

Notably, police are not required to confirm everything an informant tells them before arresting a suspect nor are informants required to be correct 100% of the time. *See United States v. Huebner,* 356 F.3d 807, 816 (7th Cir. 2004)(finding probable cause even though police could not corroborate all of facts in informant's tip); *United States v. McClinton,* 135 F.3d 1178, 1183 (7th Cir.1998)(finding probable cause even though some of informant's statements were incorrect). On the contrary, probable cause is determined using a "totality of the circumstances" test. *Gates,* 462 U.S. at 230-31.

By accurately predicting future behavior, a tipster can demonstrate "a special familiarity [the suspect's] affairs," which in turn implies that the tipster had "access to reliable information about that individual's illegal activities." *Alabama v. White,* 496 U.S. 325, 332 (1990).   In that vein, an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, "including the claim that the object of the tip is engaged in criminal activity." *Id.* at 331 (citing *Gates,* 462 U.S. at 244).

In *White*, an anonymous tipster told the police that a woman would drive from a specific apartment building to a particular motel in a brown Plymouth station wagon with a broken right taillight. The tipster further asserted that the woman <u>would be</u> transporting cocaine. 496 U.S. at 327.   After confirming the innocent details, officers stopped the station wagon as it neared the motel and found cocaine in the vehicle. *Id.* at 331. The Supreme Court held that the officers' corroboration of certain details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity.   *Id.*

In this case, each affidavit contained sufficient information to support the warrants and probable cause to believe that evidence of the firearms-related offenses would be located in Karmo's hotel room (which police had already search based upon Karmo's consent) and Karmo's residence.   First, the tipster provided information to police that she had observed first-hand. Second, she provided detailed information and corroborated her own statements by showing officers a text exchange showing Karmo and Smith in possession of firearms[3] and Karmo's Facebook page showing his frequent possession of firearms.   She provided details regarding the

---

[3] To the extent that Karmo argues that the affiants should have included Karmo's assertion in a subsequent text message to the tipster that the drum to the assault rifle pictured was a "Tokyo Maruie 200rd" drum, which Karmo reports is commonly used in an airsoft rifle, this can hardly be viewed as either affiant's deliberate or reckless omission.   Even assuming someone would have realized that "Maruie" referred only to an airsoft product, the FBI already had recovered an actual AR-15 assault rifle from Karmo's vehicle.

whereabouts of guns in Karmo's car (in a Yeti cooler), and although she did not see the guns during their brief encounter in Waverly, Iowa, the text exchange and Karmo's statements regarding having "too much shit in the car" supported her belief that they were armed with firearms.

The tipster also provided police with Karmo's phone number and Facebook username. Upon receiving the information from the tipster, law enforcement continued to investigate. They learned that Karmo lived in Missouri (consistent with the tipster's report), that he was a convicted felon, and had numerous photos on his Facebook page showing him with various firearms, including an assault rifle. All of law enforcement's further investigation corroborated the tipster's report. Moreover, the cell site location data showing Karmo's phone in Kenosha County showed the tipster's accurate prediction of future behavior. *See White*, 496 U.S. at 332. Finally, when law enforcement apprehended Karmo and recovered the firearms in the vehicle and hotel room, the tipster's information was further corroborated. By the time the affiants applied for search warrants, the tipster's information had been corroborated over and over again, confirming that the tipster was a reliable source.

Karmo's reliance on *Clark* does not alter that analysis. In *Clark*, a local investigator obtained a state drug warrant for a hotel room based on a tip from an informant. *See* 935 F.3d at 564. The informant indicated that he had driven someone to a parking lot adjacent to the hotel to buy heroin from "a black male called 'Big Mike.'" *Id.* The investigator performed surveillance at the parking lot and saw a black male leave the hotel and enter and exit five cars in the lot. The investigator also learned that the mother of a heroin user had followed a man she suspected of drug dealing to Room 203 and that the guest in Room 203 had paid cash and only was staying one night. *Id.* The application did not disclose that the informant was being paid for his services, had two pending criminal charges, had 15 prior convictions, had a history of opiate and cocaine abuse, and was hoping for sentencing credit. *Id.*

The Seventh Circuit determined that because the informant provided the only information in the affidavit specifically about drug trafficking, and because the corroboration of that information was very weak, the credibility of the paid informant was material to the probable cause determination. The Seventh Circuit also indicated that given the lack of corroboration, the omission of "so much important information *permits* (but does not require) an inference that the omissions were deliberate or reckless." *Id.* at 566. Because whether probable cause existed depended on the credibility of the paid informant, the case was remanded for a *Franks* hearing. *Id.* at 566-67.

This case was nothing like *Clark*. Karmo indicates that the affiants should have included mention of the tipster's "significant . . . criminal record" and that she seemed hesitant to let Officer Lindley read all of her communications with Karmo, which the officer believed were either "embarrassing or incriminating." Def. Mot. at 15-16. However, the tipster in this case was not a paid informant or working off a case. She was not seeking any benefit from the Waverly PD. Rather, she was a citizen witness who came to the police department to report her concerns about an armed felon traveling to the scene of large-scale unrest. She provided detail, described firsthand observations, and even provided text messages and photographs corroborating Karmo's reported possession of firearms. As to her credibility, the affidavits in question also make clear that she personally had considered going to Kenosha with Karmo so she could "loot."

In addition, when her criminal history was "omitted" from the affidavits in question, agents already had found Karmo to be in possession of firearms and ammunition. As the affidavits made clear, before seeking the warrants in question, agents already had recovered an AR-15 assault rifle, a 12-gauge shotgun, two loaded 9mm handguns, 67 rounds of 9mm ammunition, 131 shotgun shells, a homemade silencer, multiple firearm magazines, a firearm muzzle attachment, a drone, body armor, tactical gear, and a dagger. *See* **Exhibits G and H.** Given those facts, there is no

basis for inferring that including the tipster's criminal history was required under *Clark* or that its omission was a deliberate or reckless decision intended to mislead the court.

      **3.**      **The Defendant Has Failed to Make a Substantial Preliminary Showing That Any False Statement Was Material to Probable Cause.**

Even if the inclusion of the initial reporting is deemed a material misrepresentation or the absence of the tipster's background information is deemed a material omission, neither of these are more than an immaterial error and neither on their own or together rise to the type of deliberate, *material* falsity with which *Franks* is concerned.   *See e.g., United States v. Smith*, 576 F.3d 762, 765 (7th Cir. 2009) (discrepancy as to whether there were two or three controlled buys did not require *Franks* hearing); *United States v. McClellan*, 165 F. 3d 535, 545 (7th Cir. 1999) (transposed digits in address of a house in one portion of affidavit not needed for probable cause did not require *Franks* hearing).   Indeed, the Seventh Circuit has held that "an unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a *Franks* hearing."   *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000).   This is because materiality is the cornerstone of the *Franks* inquiry.

Under the materiality prong, a court must "'consider the affidavit, eliminating any false statements and incorporating omitted material facts, and determine whether probable cause existed.'" *Mullins*, 803 F.3d at 862 (quoting *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006).   Here, putting aside the initial reporting that Karmo intended to "pick people off," there remains abundant evidence in the warrant affidavit to support a finding of probable cause that evidence of Karmo's firearm possession would be found in the previously searched hotel room and in Karmo's residence.   Indeed, even after correcting the initially reported information, as was done in subsequent paragraphs of each affidavit, the following facts remain: (1) Karmo is a convicted felon; (2) Karmo drove from Missouri to Kenosha, Wisconsin, in the midst of civil unrest; (3) Karmo sent a text message with a picture showing him in possession of an assault rifle;

(4) Karmo's Facebook page contained numerous pictures of him in possession of weapons; (5) Karmo was then observed in Kenosha; (6) Karmo consented to a search of his car and hotel room; (7) agents already had recovered four firearms, a homemade silencer, numerous rounds of ammunition, body armor, and other weapons (**Exhibits G and H**); and (8) Cody Smith had told police that Karmo owned the Taurus 9mm handgun recovered and an assault rifle.   *See* Def. Mot. Exhibit 4 ¶¶ 7-42.   In addition, the agents already had photographed the items sought to be recovered in the second search of the hotel room.   *Id.* at ¶¶16, 39.

On these facts, there was a fair probability that evidence of Karmo's firearm possession would be found in another search of the hotel room and during a search of Karmo's residence. *Gates*, 462 U.S. at 238; *see e.g., United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (stating that "[p]robable cause requires only a substantial chance of criminal activity, not an actual showing of such activity").   Whether the defendant intended to loot or "take people out" makes no difference to the probable cause analysis on whether evidence of Karmo's firearms possession would be found in the hotel room or his residence.   For this additional reason alone, the request for the *Franks* hearing and motion to suppress must be denied.

## III.   CONCLUSION

For all the foregoing reasons, the United States respectfully requests that the defendant's request for a *Franks* hearing and motion to suppress be denied in its entirety.

Dated at Milwaukee, Wisconsin, this 23rd day of December, 2020.

MATTHEW D. KRUEGER
United States Attorney

By:

*s/ Margaret B. Honrath*
Margaret B. Honrath (ILBN: 6296758)
Richard G. Frohling
Assistant United States Attorneys
United States Attorney's Office
517 East Wisconsin Avenue, Room 530

24

Milwaukee, WI 53202
(414) 297-1700
Email: Margaret.Honrath@usdoj.gov