UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                   Case No. 20-CR-170 (JPS)

MICHAEL KARMO,

        Defendant.

## SENTENCING MEMORANDUM

### Background

On August 23, 2020, the officer-involved shooting of Jacob Blake sparked civil unrest and ultimately violence in Kenosha, Wisconsin. In the days following the shooting, rioters damaged and set fire to local businesses, public buildings, vehicles, and law enforcement property. Multiple people were injured; a police captain was struck in the head with a brick. Wisconsin's Governor declared a state of emergency and sent the National Guard to the city. On August 25, 2020, during the unrest, a 17-year-old, who had traveled to Kenosha from out of state, shot and killed two people and injured another using an assault rifle.

The developments in Kenosha caught the attention of Michael Karmo, a convicted felon living in rural Missouri. Mr. Karmo had been fascinated with "Antifa," Black Lives Matter protests, and civil unrest. His communications with others during the summer of 2020 often focused on these topics, along with subjects such as firearms and various conspiracy theories. As Mr. Karmo explained to a friend in July 2020, "all I care about is fucking up antifas and black lives matters mother fuckers these days." He indicated that he had been "driving back and forth across America going to where they be rioting the hardest."

The violence in Kenosha particularly intrigued Mr. Karmo. He convinced Cody Smith, a friend with whom Mr. Karmo often smoked marijuana and watched *Info Wars* (an Alex Jones production featuring conspiracy theories), to drive with him to Kenosha. To prepare for the trip, Mr. Karmo loaded an assault rifle, a shotgun, two handguns, ammunition, a silencer, body armor, and other items into their vehicle. On August 31, 2020, before setting out, Mr. Karmo took a photo of himself and Mr. Smith holding long guns. He sent the photo to a woman in Iowa. He also sent her a photo of a firearm with a large drum that he called the "game changer."

After Mr. Karmo and Mr. Smith stopped to see the woman in Iowa, she became concerned with Mr. Karmo's mental state and intentions and called the local police. Police in Iowa notified Kenosha police, who in turn alerted the FBI. Working as quickly as possible to prevent possible additional violence in Kenosha, FBI agents located and detained Mr. Karmo and Mr. Smith at a hotel in Pleasant Prairie, Wisconsin.

Searches of their vehicle and hotel room resulted in the recovery of an AR-15 assault rifle, a 12-gauge shotgun, two loaded 9mm handguns, 67 rounds of 9mm ammunition, 131 shotgun shells, what appeared to be a homemade silencer, multiple firearm magazines, a firearm muzzle attachment, a drone, body armor, tactical gear, a dagger, and other items. Facebook search warrants and a search of Mr. Karmo's residence and its "safe room" confirmed his fascination with possessing and shooting firearms.

A search of Mr. Karmo's phone also led to discovery of various videos that made his mindset clear. In one video, Mr. Karmo detailed the firearms they brought to Kenosha. *See* Exhibit A.[1] In that same video, he talked about being on the streets around midnight that evening, "when the thugs come out" and would be ready to act if the police and National Guard

---

[1] This video and the two others (Exhibits A, B, and C) will be provided to the Court on a disk in advance of the sentencing hearing. These videos were included in the discovery produced to defense.

were not "handling business" to his satisfaction. *Id.* In another video, Mr. Karmo referred to protestors as "a bunch of victims" and stated that all of these "motherfuckers gonna go." Exhibit B. Finally, in a video taken the day of his arrest, Mr. Karmo filmed an individual chanting "Justice for Jacob Blake." Exhibit C. Referring to this individual, Mr. Karmo stated that he would be back to "lay the punk. . . out later." *Id.* Mr. Karmo was arrested before getting the opportunity to "lay out" anyone that evening.

Mr. Karmo has since pleaded guilty to being a felon in possession of firearms, and the Court has scheduled his sentencing hearing for December 29, 2022. For the reasons set forth below, the Court should sentence Mr. Karmo to 72 months in prison.

**I.      The Court should impose a sentence of 72 months' imprisonment.**

**A.      Legal framework.**

When determining an appropriate sentence, courts must consider the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). These factors include:

(1)   The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   The need for the sentence imposed to:

   (A)   Reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)   Afford adequate deterrence to criminal conduct;

   (C)   Protect the public from further crimes of the defendant; and

   (D)   Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   The kinds of sentences available;

(4)   The advisory guideline range;

3

(5)   Any pertinent policy statements issued by the Sentencing Commission; and

(6)   The need to avoid unwarranted sentence disparities.

See 18 U.S.C. § 3553(a). In Mr. Karmo's case, these factors support a sentence of 72 months in prison.

### B.   Mr. Karmo's offense was serious in nature.

The nature of the offense is generally set forth in Paragraphs 11-20 of the PSR. In sum, despite being a convicted felon, Mr. Karmo unlawfully possessed firearms and ammunition. Although this violation always is a serious offense, the nature of Mr. Karmo's offense is far more troubling than the possession of a single firearm by a prohibited person. Rather, Mr. Karmo gathered a small arsenal, body armor, and a homemade silencer for the specific purpose of heading to the scene of ongoing violence – a scene that Magistrate Judge Dries described as a "powder keg" during Mr. Karmo's detention hearing.

While in Kenosha, Mr. Karmo filmed himself stating that he was going to "lay out" a protestor, stating that all of the protesting "mother fuckers" were "gonna go," and stating that he would engage with protestors if police and the National Guard weren't acting to his satisfaction. That conduct is particularly concerning given what had been occurring in the area, Mr. Karmo's temper, and Mr. Karmo's fascination with violence and firearms. In fact, Mr. Karmo's codefendant reported that during 2020, Mr. Karmo had spoken of a desire to kill Antifa and Black Lives Matter members and of his intention to target people like Dr. Anthony Fauci.

Simply put, Mr. Karmo's offense was serious and posed a significant risk of danger to others.

### C. Mr. Karmo's history and characteristics warrant a 72-month sentence.

Mr. Karmo's criminal history and personal characteristics support a lengthy prison sentence.

#### 1. Criminal history.

Mr. Karmo, age 40 at the time of the offense, has a lengthy criminal history. The PSR places him in Criminal History Category VI (15 points). *See* PSR ¶¶ 58-69. His convictions include vehicle theft, multiple burglaries, possessing a firearm after a violent felony conviction, evading an officer, receiving stolen property, false imprisonment, and multiple offenses related to possession of controlled substance. He also had related counts (including a battery offense) dismissed, and the PSR lists seven other arrests.

His history also demonstrates a pattern of being unable or unwilling to follow the rules of supervision. Many of the above offenses involve reoffending or committing other violations that resulted in revocations. *See, e.g.,* PSR ¶¶ 59, 60, 63, 64-67.

Finally, although some offenders pose a declining risk of violence as they age, Mr. Karmo has demonstrated an ongoing risk. He was known to have a temper, and in 2020 (at age 40), he texted about using firearms and "fucking up" Antifa. He told Cody Smith that he wanted to kill Dr. Anthony Fauci and had Mr. Smith take screenshots when Dr. Fauci's address appeared on *Info Wars*. Just hours before his arrest, Mr. Karmo also shot a video talking about his intent to do physical harm to a peaceful protestor. Finally, Mr. Karmo had been fired from his most recent employment in Missouri or getting into a physical altercation with coworker. *See* PSR ¶ 104.

In sum, his criminal history and continued interest in violence warrant a lengthy prison sentence.

5

Case 2:20-cr-00170-JPS   Filed 12/22/22   Page 5 of 9   Document 92

### 2. Mr. Karmo's willingness to provide false information.

Also relevant to his history and characteristics is the fact that Mr. Karmo was willing to provide false information following his arrest. Although Mr. Karmo acknowledged that he would be willing to take action if police were defunded, Mr. Karmo claimed that all of the guns recovered by the FBI in Kenosha belonged to Mr. Smith. Mr. Karmo stated that he did not own any firearms except an air rifle and had not fired a gun for many years. Mr. Karmo claimed that he never carried a pistol. Mr. Karmo also claimed that he did not know anything about any suppressors or silencers found in their vehicle. Mr. Karmo also acknowledged that he had stopped to see a woman in Iowa but had left because a group of four Black men who looked like "thugs." As detailed in the PSR, the material aspects of his statement were demonstrably false.

### 3. Unemployment fraud.

Mr. Karmo also appears to have been willing to engage in unemployment fraud. As the PSR explains, Mr. Karmo told Mr. Smith that Mr. Karmo and some of his family members were committing unemployment fraud in the state of California related to the pandemic. Mr. Karmo had offered to include Mr. Smith. *See* PSR ¶ 40. Although Mr. Karmo has denied any such conduct, on August 11, 2020, Mr. Karmo sent the following text message to Mr. Smith: "[One of Mr. Karmo's sisters] got approved forr [sic.] 20 k [$20,000] on that self employed shit in cali!!" As such, the information seems reliable and credible for sentencing purposes.

### 4. Other characteristics.

A few aspects of the Mr. Karmo's history and characteristics are more positive. For example, Mr. Karmo enjoys the support of his parents and at least one of his siblings. Although his parents and siblings were aware of his unlawful possession of firearms and interest in

6

conspiracy theories, they were not aware of his plan to travel to Kenosha to engage protestors if he deemed it necessary.

Another positive is that Mr. Karmo has taken classes and expressed a desire to obtain a CDL while in pretrial detention. Those are positive steps. However, Mr. Karmo might need support or direction to follow through after his release. In that regard, although he successfully completed wildfire training as part of a program for individuals in the criminal justice system, he did not follow through with seeking and maintaining gainful employment.

### D. The factors set forth in § 3553(a)(2) support a prison sentence.

The factors set forth in § 3553(a)(2) also support a 72-month sentence. As noted above, this was a serious offense. Mr. Karmo did not act spontaneously. Rather, at a time when Kenosha and much of the country was on edge, Mr. Karmo drove over 700 miles to bring weapons to the scene of ongoing violence and unrest. Mr. Karmo came ready to fight and, based on his statements on his videos and communications with others, he was eager to act as a vigilante.

Given the above facts, a sentence of 72 months would be sufficient to reflect the seriousness of the offense and provide just punishment. A lesser punishment would undermine respect for the law and undermine public confidence in the justice system. The public would not understand why a lesser sentence would be appropriate for a felon who: (1) armed himself with an assault rifle, other firearms, a cache of ammunition, and body armor; (2) bragged about his intolerance of protestors he viewed as "antifa"; (3) described one of his rifles as the "game changer"; (4) traveled across the Midwest to be present at a violent scene; and (5) recorded himself stating that he planned to "lay out" a protestor on the night of his arrest.

A sentence of 72 months also would provide deterrence to others who might be inclined to "take matters into their own hands" rather than relying on law enforcement. Like Mr. Karmo, many

individuals engage in anti-government rhetoric, express threats, and post support for conspiracy theories online. The Court should sentence Mr. Karmo in a manner that deters these individuals from crossing the line and taking unlawful actions based on those views.

Finally, during his prison term, Mr. Karmo could participate in vocational training and cognitive intervention programs. These types of programs could help mitigate any risk of future wrongdoing.

E. **The advisory guideline range.**

Mr. Karmo faces an anticipated guideline range of 77 to 96 months. *See* PSR ¶ 113. This is the result of a base offense level of 20, an increase of 4 levels for possessing at least 8 firearms, a 3-level decrease for acceptance of responsibility, and a Criminal History Category of VI. *See* PSR ¶¶ 46-55; 68-69. A sentence of 72 months would fall five months below his advisory guidelines.

F. **A sentence of 72 months would avoid unwarranted disparities.**

Sentencing Mr. Karmo to 72 months also would avoid unwarranted disparities. Generally speaking, a sentence within the applicable guideline range is the best way to avoid unwarranted disparities under § 3553(a)(6). *See United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). In this case, a sentence of 72 months is just below the applicable range. By hewing close (but just below) the guidelines, the Court could avoid any inappropriate disparities between this case and others involving unlawful possession of at least eight firearms.

II. **Conclusion.**

Based on all of the § 3553(a) factors and the information set forth above and in the PSR, the Court should impose a 72-month sentence.

Dated at Milwaukee, Wisconsin, this 22nd day of December, 2022.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By:

s/Richard G. Frohling
First Assistant United States Attorney
Wisconsin Bar Number 1021952
E-Mail: richard.frohling@usdoj.gov

s/ Margaret B. Honrath
Deputy Criminal Division Chief
Illinois Bar Number 6296758
Email: Margaret.Honrath@usdoj.gov

Office of the United States Attorney
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738